# United States Court of Appeals
## For the First Circuit

No. 05-2827

RANDALL TRAPP,

Petitioner, Appellant,

v.

LUIS SPENCER,
Superintendent, MCI -- Norfolk,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Selya, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lynch, Circuit Judge.

John M. Thompson, with whom Thompson & Thompson, P.C. was on brief, for appellant.
Randall E. Ravitz, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellee.

March 1, 2007

**LYNCH**, **Circuit Judge**. This case involves whether the district court erred in not applying the equitable tolling doctrine to excuse the late filing of a federal habeas petition where (1) the public-defender counsel for the state prisoner simply made a mistake as to the habeas limitations period, and (2) the petitioner makes a claim that the totality of the circumstances nonetheless warrants equitable tolling.

The Supreme Court has just rejected the argument that because the mistake was made by a state public defender and the defendant himself was diligent, the defendant should not be held to the mistake of his lawyer. Lawrence v. Florida, 549 U.S. ___, No. 05-8820, 2007 WL 505972, at *6 (Feb. 20, 2007). Lawrence held that

> [a]ttorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel. . . . [Petitioner] argues that his case presents special circumstances because the state courts appointed and supervised his counsel. But a State's effort to assist prisoners in postconviction proceedings does not make the State accountable for a prisoner's delay.

Id. (citation omitted).

Trapp's main argument is slightly different from that rejected in Lawrence. Trapp argues that Massachusetts has a policy that whenever the state provides counsel to an indigent person, that counsel is furnished with a guarantee of effective

-2-

assistance. Thus, he argues, he was entitled to rely on his attorney and should not be held responsible for her mistake. We hold that this is a distinction without a difference. Lawrence still governs. The result Trapp seeks would be utterly inconsistent with Lawrence's rationale that equitable tolling is rare and available only in extraordinary circumstances.

Trapp's second argument is that the totality of the circumstances qualifies him for equitable tolling, an argument rejected by the district court. We affirm the dismissal of the petition for failure to comply with the limitations period.

I.

We briefly recount the facts, which are recited in greater detail in Commonwealth v. Trapp [Trapp I], 485 N.E.2d 162 (Mass. 1985), and Commonwealth v. Trapp [Trapp II], 668 N.E.2d 327 (Mass. 1996), affirming Trapp's conviction for murder and his life sentence.

On May 8, 1981, Randall Trapp stabbed to death Lawrence Norton, a man he had met in a bar the night before. Following the stabbing, which occurred in Norton's home, Trapp stole Norton's landlord's money and the landlord's mother's car. Trapp II, 668 N.E.2d at 329; Trapp I, 485 N.E.2d at 164. In 1982, Trapp was tried before a jury in Massachusetts state court. At trial, he defended on the ground that he lacked criminal responsibility for his actions. Trapp I, 485 N.E.2d at 164. He

presented expert testimony that the murder was the product of (1) an organic brain abnormality (caused by earlier head traumas, some of which were the result of beatings by his father) and (2) psychological stress attributable to his wife's "deviant behavior," which included working as a prostitute and a stripper and being "openly and promiscuously bisexual." Id. at 164 & n.2. Trapp was convicted of first-degree murder, armed robbery, and larceny of a motor vehicle, id. at 163, but the conviction was overturned on appeal because improper character evidence had been admitted at trial, id. at 165.

Trapp was retried in 1987, and he again defended on the basis that he was not criminally responsible. Trapp II, 668 N.E.2d at 329. During the seven-day trial, seven experts, including three for the prosecution and four for the defense, testified on the issue of Trapp's criminal responsibility. Id. As part of their testimony, these experts offered their interpretations of a computed axial tomography (CAT) scan of Trapp's brain.[1] In particular, Trapp's primary medical expert, Dr. Vernon Mark, testified that the CAT scan showed an enlarged area in the "right temporal horn" where "spinal fluid fill[ed] within the temporal lobe." Trapp's experts offered testimony as

_____

[1] The prosecution also presented expert testimony on a BEAM analysis that had been ordered by Trapp's trial counsel (but which his counsel had not intended to use at trial). Trapp II, 668 N.E.2d at 332. The BEAM analysis, however, measures only activity at the surface of the brain, while Trapp's apparent brain defect is deep within the brain.

-4-

to the effects of such an abnormality, and testified that Trapp suffered from intermittent explosive disorder and organic personality disorder. By contrast, the Commonwealth's primary medical expert, Dr. Paul F. New, testified that Trapp's CAT scan did not show an enlarged temporal horn or any brain abnormality. The Commonwealth's additional experts offered testimony consistent with Dr. New's. Trapp also presented the testimony of lay witnesses, who described occasions prior to the homicide on which Trapp had behaved strangely. Id. After deliberating for two days, the jury convicted Trapp of first-degree murder based on extreme atrocity or cruelty.[2] Id. He was sentenced to a mandatory term of life imprisonment.

Trapp appealed his conviction on a number of grounds. He also moved in the state trial court for a new trial, claiming that his trial counsel was ineffective because he failed to present certain evidence at trial and because his presentation of other evidence was not persuasive. The motion for a new trial was denied, and Trapp's appeal therefrom was consolidated with his appeal from his conviction. On July 31, 1996, the Supreme Judicial Court (SJC) affirmed Trapp's convictions. Id. at 333.

Trapp then filed a petition for a writ of certiorari, which was denied on December 16, 1996. See Trapp v.

---

[2] Trapp also was again convicted of armed robbery and larceny of a motor vehicle. Trapp II, 668 N.E.2d at 365 n.6.

-5-

Massachusetts, 519 U.S. 1045 (1996). As we explain below, it was at this point that the clock began to run on the one-year period for the filing of a petition for a writ of habeas corpus in federal court, subject to statutory exclusions. See 28 U.S.C. § 2244(d)(1).

On July 31, 1997, Trapp filed in the state trial court a second motion for a new trial, based on the facts that he had been "forced" to stand trial in prison clothing, that the record had been "deficient at the time of his direct appeal," and that the prosecution had used at trial results of a BEAM analysis that Trapp's counsel originally had ordered but had not intended to use and had not in fact used at trial.[3] Trapp appended to his new trial motion a motion requesting court-appointed counsel. The motions were denied on September 7, 1997. On October 6, 1997, Trapp filed a gate-keeper motion requesting leave to appeal the denial of his motions for a new trial and for appointment of counsel to the SJC. As grounds for a new trial he reasserted his arguments that his constitutional rights had been violated when he was forced to stand trial in prison clothing and when the

---

[3] On direct appeal, Trapp had objected to the trial judge's allowing discovery of these BEAM test results. See Trapp II, 668 N.E.2d at 332; see also supra note 1. The SJC held that even if it had been error to permit the discovery, there had been no prejudice to Trapp because the test results were used only in rebuttal, the results themselves were not put into evidence, and the results did not contain any testimonial statements by Trapp. Trapp II, 668 N.E.2d at 332.

-6-

prosecution was permitted to discover and use the results of the BEAM analysis.

On May 10, 1999, the Committee for Public Counsel Services (CPCS) -- a Massachusetts state defender service that provides legal counsel to indigent defendants -- assigned counsel to Trapp's case. Trapp's counsel requested that the SJC stay activity in Trapp's case pending resolution of motions to be filed in the trial court. The SJC thus did not rule on Trapp's still-pending gate-keeper motion.

On June 6, 2000, Trapp filed a motion in the state trial court requesting funds to conduct additional tests on his brain, including a positron emission tomography (PET) scan, a more advanced imaging technique than the CAT scan available at the time of Trapp's second trial.[4] The state trial court denied the motion and the subsequent motion for reconsideration. Eventually, Trapp's family secured funds for a PET scan, which was performed on June 25, 2001. The doctor who read the PET scan stated that it showed "mildly decreased metabolism in the medial aspects of the temporal lobes bilaterally," which was possibly "related to memory impairment or . . . interictal seizure foci."

On October 5, 2001, Trapp filed in the state trial court a motion for a new trial based on the results of the PET scan, which he characterized as new evidence. The motion was

---

[4] While a CAT scan reveals only the anatomical structure of the brain, a PET scan apparently reveals brain functioning.

-7-

denied on June 27, 2002. The motion judge found that Trapp had failed to present any evidence of the qualifications of the doctor who had read the PET scan and had failed to present a "qualified expert's opinion . . . that the PET scan results support[ed] the trial testimony of [Trapp]'s experts." Moreover, he found the results of the PET scan to be "less than dramatic," questioned whether the PET scan was "probative of [Trapp's] brain function twenty years earlier," and found that even if it were, it was cumulative of other trial evidence. The motion judge denied Trapp's motion for reconsideration, finding an additional physician's affidavit submitted by Trapp to be "too flimsy to provide a basis to change [his earlier] ruling."

Trapp appealed to the SJC. On April 27, 2004, a single justice of the SJC treated the appeal as an application for leave to appeal to the full court, which she denied. The justice held that "[t]he results of the PET scan [were] not new evidence." She stated that "the PET scan indicate[d] the same abnormality" testified to at Trapp's second trial, and that "the PET scan results [were] merely cumulative." She further noted the lack of evidence "to establish that a PET scan conducted in 2001 [was] probative of [Trapp]'s brain function twenty years earlier." The SJC justice also denied Trapp's October 16, 1997 gate-keeper motion on the ground that the SJC had already decided the issue. On May 25, 2004, the single justice denied Trapp's motion for

reconsideration.  Trapp did not petition the United States Supreme Court for certiorari.

One year later, on May 25, 2005, Trapp filed a petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts.

Respondent Luis Spencer, Superintendent, MCI -- Norfolk, moved the district court to dismiss the petition as time barred.  See 28 U.S.C. § 2244(d)(1).  Trapp conceded that the petition was not timely filed because of an error on the part of his counsel, but he requested that the district court equitably toll the applicable limitations period and permit the petition. In a careful, well-reasoned opinion, a United States Magistrate Judge recommended that Trapp's petition be dismissed.  On October 24, 2005, the district court adopted this recommendation and dismissed the petition as time barred.

On February 6, 2006, the district court granted Trapp a certificate of appealability on the issue of whether the doctrine of equitable tolling should toll the one-year limitations period provided for by 28 U.S.C. § 2244(d)(1) in Trapp's case.

II.

We review the district court's denial of equitable tolling for abuse of discretion.  Cordle v. Guarino, 428 F.3d 46, 47 (1st Cir. 2005); Neverson v. Farquharson, 366 F.3d 32, 42 (1st Cir. 2004).

A.      Timeliness

We briefly explain why the petition is admittedly late in order to assist counsel in avoiding late filing. AEDPA provides for a one-year period of limitations during which "a person in custody pursuant to the judgment of a State court" may apply for federal habeas relief. 28 U.S.C. § 2244(d)(1). For present purposes, the limitations period began to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Id. § 2244(d)(1)(A). When the Supreme Court denied Trapp's petition for certiorari on December 16, 1996, Trapp's conviction became final, and the AEDPA period of limitations began to run. See Lawrence, 2007 WL 505972, at *2; Clay v. United States, 537 U.S. 522, 527 (2003) (stating that in the context of post-conviction relief, "[f]inality attaches when [the Supreme] Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari").

Under 28 U.S.C. § 2244(d)(2), the limitations period is tolled for the time during which "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." Section 2244(d)(2) does not reset the clock on the limitations period, however, but merely stops it temporarily, until the relevant applications for review are ruled upon. Cordle, 428 F.3d at 48

-10-

n.4; <u>Dunker</u> v. <u>Bissonnette</u>, 154 F. Supp. 2d 95, 103 (D. Mass. 2001) ("Section 2244(d)(2) only stops, but does not reset, the clock from ticking . . . [and] cannot revive a time period that has already expired." (alteration and omission in original) (quoting <u>Sorce</u> v. <u>Artuz</u>, 73 F. Supp. 2d 292, 294 (E.D.N.Y. 1999)) (internal quotation marks omitted)). Approximately 226 days elapsed between the denial of Trapp's petition for certiorari and his filing of a new trial motion on July 31, 1997. Even assuming that the limitations period was tolled for the entire period from July 31, 1997 until May 25, 2004, when the SJC ruled on Trapp's gate-keeper petition, Trapp's petition for habeas relief was untimely. There is no dispute as to this fact.

B.      <u>Equitable Tolling</u>

In <u>Lawrence</u>, the Supreme Court again side-stepped the question of whether equitable tolling ever applies to time limits for the filing of federal habeas petitions by state prisoners, and simply assumed arguendo that equitable tolling is available. 2007 WL 505972, at *6. <u>Lawrence</u> did say several useful things about the doctrine.

For example, the <u>Lawrence</u> Court refused to vary its interpretation of AEDPA's statutory tolling provision in light of "an exceedingly rare inequity that Congress almost certainly was not contemplating" when enacting the limitations period, and stated that such situations "may well be cured by equitable

-11-

tolling." Id. at *5.  Next, the Court referred to the standards for equitable tolling articulated in Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005): a petitioner must show that he has been pursuing his rights diligently and that some extraordinary circumstance prevented him from making a timely filing. Lawrence, 2007 WL 505972, at *6.  Finally, Lawrence affirmed without dissent the circuit court's finding that the petitioner there had not otherwise made out a case of extraordinary circumstances.  Id. at *6-7; id. at *10 n.8 (Ginsburg, J., dissenting) (declining to reach the equitable tolling issue).

In another recent case, Wallace v. Kato, 549 U.S. ___, No. 05-1240, 2007 WL 517122 (Feb. 21, 2007), the Supreme Court made clear, albeit in the context of a § 1983 action, that "[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."  Id. at *7.

In this circuit, we have allowed for equitable tolling of the § 2244(d)(1) limitations period in rare and extraordinary cases.  "[T]he one-year limitations period in § 2244(d)(1) is not jurisdictional and, accordingly, can be subject to equitable tolling in appropriate cases."  Neverson, 366 F.3d at 41.  Trapp bears the burden of establishing a basis for equitable tolling. Id.

In the habeas context in particular, courts must take care "to avoid upsetting the 'strong concern for finality' embodied in [28 U.S.C.] § 2254." Id. at 42 (quoting Brackett v. United States, 270 F.3d 60, 67 (1st Cir. 2001)). Likewise, we are acutely aware that "[o]ne of AEDPA's main purposes was to compel habeas petitions to be filed promptly after conviction and direct review." David v. Hall, 318 F.3d 343, 346 (1st Cir. 2003). As a result, equitable tolling "is the exception rather than the rule; resort to its prophylaxis is deemed justified only in extraordinary circumstances." Donovan v. Maine, 276 F.3d 87, 93 (1st Cir. 2002) (alteration omitted) (quoting Delaney v. Matesanz, 264 F.3d 7, 14 (1st Cir. 2001)) (internal quotation marks omitted).

In applying the equitable tolling doctrine, an important factor is the reason for the late filing. Generally, in civil cases, "garden-variety" attorney negligence, even if excusable, is not grounds for equitable tolling. Irwin v. Dep't of Veterans' Affairs, 498 U.S. 89, 96 (1990). Rather, a petitioner must demonstrate the existence of extraordinary circumstances. Pace, 544 U.S. at 418.

This circuit, along with many others, has held that "mistake by counsel in reading [AEDPA] or computing the time limit is, at most, a routine error" and does not constitute extraordinary circumstances warranting equitable tolling. David,

-13-

318 F.3d at 346; see also Miranda v. Castro, 292 F.3d 1063, 1066-68 (9th Cir. 2002); Smaldone v. Senkowski, 273 F.3d 133, 138-39 (2d Cir. 2001); Helton v. Sec'y for the Dep't of Corr., 259 F.3d 1310, 1313 (11th Cir. 2001) (per curiam); Kreutzer v. Bowersox, 231 F.3d 460, 463 (8th Cir. 2000); Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000); Taliani v. Chrans, 189 F.3d 597, 597-98 (7th Cir. 1999). The Supreme Court confirmed as much in Lawrence. 2007 WL 505972, at *6 ("Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel.").

In David v. Hall, a case quite similar to the one before us, the petitioner's attorney had misunderstood the calculation of the AEDPA limitations period and had filed a habeas petition after the limitations period had expired. 318 F.3d at 344. Like Trapp's attorney, the attorney in David filed an affidavit stating that he could have filed the petition earlier but was under the impression that he was not required to do so. Id. at 345. David rejected the argument that equitable tolling was warranted, stating, "If carelessness were an escape hatch from statutes of limitations, they would hardly ever bar claims." Id. at 346.

This does not mean, however, that attorney error never can be among the grounds for equitable tolling. Several of our

-14-

sister circuits have, on specific facts, found an attorney's failure to file a timely habeas petition so egregious as to warrant equitable tolling of the AEDPA limitations period.[5]  For example, in Baldayaque v. United States, 338 F.3d 145 (2d Cir. 2003), the Second Circuit found an attorney's failure to file a habeas petition when the petitioner's wife had hired him specifically to do so sufficient to warrant equitable tolling. Id. at 152-53.  In Spitsyn v. Moore, 345 F.3d 796 (9th Cir. 2003), the Ninth Circuit found that equitable tolling was appropriate when the petitioner's attorney ignored the statutory deadline for filing a habeas petition and refused, after having been terminated, to provide the petitioner with his case file, thereby causing him to miss the deadline for filing a petition. Id. at 798, 801.  Moreover, both the Eighth and Second Circuits have found equitable tolling to be appropriate when an attorney deceived the petitioner by informing him that a timely petition had been filed when in fact it had not.  United States v. Martin, 408 F.3d 1089, 1093-95 (8th Cir. 2005); United States v. Wynn, 292 F.3d 226, 230 (5th Cir. 2002).

Likewise, some circuits have held that in particular circumstances, otherwise unremarkable attorney error may warrant equitable tolling.  The Sixth Circuit, for example, has held that

_____

[5]  We make no determination about the correctness of the decisions that we describe here.  We include them merely as exemplars.

if the law defining the limitations period is unclear, "constitutional review should not be forfeited unless there has been a lack of good faith diligence on the part of the petitioner." Griffin v. Rogers, 399 F.3d 626, 636-38 (6th Cir. 2005).

Similarly, courts may be more willing to grant equitable tolling in death penalty cases, particularly when the petitioner has been diligent in pursuing his rights.[6] See, e.g., Fahy v. Horn, 240 F.3d 239, 244-45 (3d Cir. 2001); cf. Gardner v. Florida, 430 U.S. 349, 357 (1977) ("[D]eath is a different kind of punishment from any other which may be imposed in this country."); Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long."). But see Johnson v. McBride, 381 F.3d 587, 590-91 (7th Cir. 2004) (rejecting the view that a different test applies to capital cases); Rouse v. Lee, 339 F.3d 238, 253-56 (4th Cir. 2003) (en banc) (same). Trapp was not sentenced to death.

We delineate here some of those factors that may influence a court's decision whether or not to grant equitable

---

[6]     Although Lawrence was a capital case, the question of whether equitable tolling was warranted because Lawrence had been sentenced to death was not before the Court. See Petition for Cert. at ii-iii, Lawrence, 549 U.S. ___, 2006 WL 776784.

tolling in a habeas case.[7]  Under Pace and our own precedent, relevant factors include:

1. The petitioner's own diligence in pursuing habeas relief, see, e.g., Pace, 544 U.S. at 419; Lattimore v. Dubois, 311 F.3d 46, 55 (1st Cir. 2002);

2. Whether some extraordinary circumstance prevented the petitioner from making a timely filing, see, e.g., Pace, 544 U.S. at 418; Neverson, 366 F.3d at 43;

3. The petitioner's diligence in the pursuit of other post-conviction remedies and the process already afforded in the state system, see, e.g., Pace, 544 U.S. at 418-19; Delaney, 264 F.3d at 14-15;

4. Any prejudice to the prosecution that would result from tolling and possible retrial, see David, 318 F.3d at 347;

5. The fact that equitable tolling is not available in cases of dubious merit,[8] see Lattimore, 311 F.3d at 55 (discussing likelihood of success on the merits in determining that equitable tolling was not warranted); Brackett, 270 F.3d at 71 (same), overruled on other grounds by Johnson v. United States, 544 U.S. 295, 302 (2005); and

---

[7]    Trapp has not made an "actual innocence" argument.  In David, we cast a jaundiced eye on such arguments.  See 318 F.3d at 347.

[8]    There is language in Cordle rejecting a prisoner's attempt to use likelihood of success on the merits to excuse an otherwise unjustified failure to meet the limitations period.  428 F.3d at 49.  This should not be inconsistent with our rule that equitable tolling is not available in cases of dubious merit.

6. Whether or not the case is a capital case and whether or not the petitioner has been sentenced to death, see David, 318 F.3d at 346 n.4.

The district court's conclusion, based on consideration of the totality of the circumstances (including all of the factors enumerated above), was not an abuse of discretion.

The magistrate judge appropriately considered not only the reason for the late filing, but concluded that the defendant himself was not to blame and had been diligent. She also considered whether the entire course of post-conviction proceedings had been diligently pursued, given that the state conviction became final with the denial of certiorari on December 16, 1996, but the federal habeas petition was not brought until almost a decade later, in 2005. This is a significant consideration in light of the finality concerns that motivated Congress in enacting 28 U.S.C. § 2254. See Pace, 544 U.S. at 419 ("Under long-established principles, petitioner's lack of diligence precludes equity's operation."). The magistrate judge made no error in concluding as a matter of fact that counsel had not been particularly diligent in pursuing the state claims, or for that matter, waiting until what counsel thought was the last day on which to file the federal habeas petition. The magistrate judge was careful to distinguish counsel's lack of diligence from Trapp's own diligence, at least as to preserving Trapp's federal

-18-

habeas claims. Further, she recognized the special conditions -- organic brain damage -- under which Trapp operated. Those conditions were not, however, the cause of the late filing. See Calderon v. U.S. Dist. Court, 163 F.3d 530, 541 (9th Cir. 1998) (holding that a petitioner's mental incompetency can constitute extraordinary circumstances warranting equitable tolling if it interferes with his ability to communicate with his attorney), overruled on other grounds by Woodford v. Garceau, 538 U.S. 202, 205-06 (2003).

The magistrate judge correctly considered as a factor the prejudice the state would suffer if it were forced to relitigate a murder case about events that had occurred twenty-four years prior to the filing of the habeas petition.

The magistrate judge also correctly considered the considerable process that had already been afforded to Trapp in the state system. The issue of Trapp's criminal responsibility was considered by the jury that convicted him, and the impact of the PET scan evidence itself on the validity of Trapp's conviction was considered and reconsidered by a motion judge and a justice of the Supreme Judicial Court. The magistrate judge set forth the reasons the state courts had rejected Trapp's claims.

Finally, this was not a death penalty case in which avoidance of error has a very high premium.

We make one more comment lest Trapp spend the remainder of his years in state prison blaming his attorney for missing a filing deadline. Trapp's petition had a low likelihood of success. The state courts carefully considered Trapp's claims on their merits. As the single SJC justice who ruled on Trapp's gate-keeper motion noted, Trapp's new evidence is consistent with evidence presented at his trial. The brain abnormality supposedly shown by the PET scan is the same abnormality supposedly shown by the CAT scan and to which experts testified at Trapp's trial. At the time, the prosecution did present an alternative interpretation of Trapp's CAT scan, which may be undermined by the PET scan. But the prosecution also presented evidence at trial that at the time of the killing, Trapp had acted rationally and shrewdly. There was evidence that Trapp had robbed the owner of the home where the killing occurred, had stolen the landlord's mother's car to flee the scene, and had later abandoned the car. Trapp I, 485 N.E.2d at 164. There also was evidence that Trapp had attempted to kidnap the landlord, who knew that Norton was dead, and had pursued the landlord when he had escaped, but had then fled when the landlord reached a neighbor's home. Id. The jury that convicted Trapp considered the issue of his brain abnormality and rejected the argument that it excused his behavior. Moreover, it is not clear that a PET

-20-

scan performed twenty years after the murder reflects the condition of Trapp's brain at the time of the crime.

Under these circumstances, the thoughtful analysis of the district court and the magistrate judge was not an abuse of discretion. The dismissal of Trapp's petition for habeas corpus is <u>affirmed</u>.